**UNITED STATES of America,**

.v.

**David RIBLER, Defendant.**

United States District Court
S. D. New York.

Dec. 13, 1956.

Supplemental Opinion Dec. 20, 1956.

Paul Williams, U. S. Atty. for the Southern District of N. Y., New York City, by Edward R. Cunniffe, Jr., New York City, of counsel, for plaintiff.

Raymond Kestenbaum, New York City, for defendant.

EDELSTEIN, District Judge.

The defendant has moved for resentencing, on the ground of health and for other reasons directed to the discretion of the court. While serving a sentence in a state penitentiary, imposed by a New York court, he was brought before this court on a habeas corpus ad prosequendum to plead to a ten count indictment. Upon a plea of guilty to all counts, I sentenced him, on December 30, 1952, to one year on count one, to begin after completion of the sentence he was then serving at

Sing Sing Prison; imposition of sentence on the remaining counts was suspended and he was placed upon probation for two years after the completion of the sentence on count one. The judgment and order of commitment ordered the issuance of a bench warrant. The defendant was returned to Sing Sing where he served until his release on November 20, 1956. Upon his release he was arrested by a United States Marshal and conveyed to the United States Courthouse, Foley Square, New York, where he was placed in the marshal's cell block. The marshal endorsed the bench warrant, on November 20, 1956, as follows: "Received this warrant 30th day of Dec., 1952 at New York City and executed the same by arresting the within named David Ribler at Sing Sing Prison, Ossining, N. Y., on the 20th day of Nov. 1956, and have his body now in Court, as within I am commanded." The notice of motion for resentence was served on the United States Attorney while the prisoner was being detained in the cell block in the courthouse. He was taken to Federal Detention Headquarters at 5:33 p. m. of the same day.

▬ The relief sought is the suspension of the execution of the one year sentence, pursuant to 18 U.S.C. § 3651. The time is long past for a reduction of the sentence under Rule 35, Federal Rules of Criminal Procedure, 18 U.S.C., but the time within which probation may be granted is governed by the Probation Act and not by Rule 35. Phillips v. United States, 8 Cir., 212 F.2d 327; Kelley v. United States, 10 Cir., 209 F.2d 638. The probationary power of the court ceases with the beginning of the service of the sentence. United States v. Murray, 275 U.S. 347, 357, 48 S.Ct. 146, 72 L.Ed. 309. Where there are consecutive sentences composing a single cumulative sentence, the probationary power ceases immediately upon imprisonment for any part of the cumulative sentence. Affronti v. United States, 350 U.S. 79, 76 S.Ct. 171, 100 L.Ed. 62. But inasmuch as the consecutive state and federal sentences imposed upon Ribler do not constitute a single cumulative sentence, the issue to be determined, in order to ascertain the court's power to grant probation at this time, is whether the motion was made before the prisoner commenced his federal sentence.

Section 3568 of Title 18 U.S.Code, provides:

"If any * * * person shall be committed to a jail or other place of detention to wait transportation to the place at which his sentence is to be served, his sentence shall commence to run from the date on which he is received at such jail or other place of detention."

The prisoner was in the courthouse cell block when the motion was made. The problem posed, therefore, is whether he was then in a place of detention awaiting transportation to the place at which his sentence was to be served, so as to commence the running of his sentence.

It was held in Moody v. Johnston, 9 Cir., 70 F.2d 835, that a detention room adjoining a courtroom was not a place of detention where sentence could commence. It is doubtful that a cell block in the courthouse is in a different category from such a detention room. Even if it should be, it cannot be said that the prisoner was in a place of detention to await transportation to the place at which he was to serve his sentence. He did not go to such a place from the courthouse cell block, for he was taken directly to Federal Detention Headquarters at West Street. He could not have started on his journey to prison from the courthouse cell block, for the Attorney General had not (from all that appears in the affidavits) designated the institution in which he was to be confined. There appears to have been no intention to detain the prisoner in the courthouse until his journey to the penitentiary should begin. He was taken there, apparently, for the convenience of the marshal, before his delivery to West Street. It was at West Street where he awaited transportation to a penitentiary, as evidenced by the marshal's endorsement on a certified copy of

the judgment and commitment order: "I have executed the within Judgment and Commitment as follows: * * * Defendant delivered on Nov. 20, 1956 to Warden, Federal Detention Hdqrts., New York, N. Y. for service of sentence at that institution, or for transportation to another institution designated by the Attorney General, by prison van."

In any event, it appears from the marshal's endorsement on the bench warrant that his prisoner was, when brought to the courthouse, delivered into court. And since he was not at that time transferred to executive custody, he cannot be said to have commenced to serve the term of imprisonment provided for in the sentence imposed. Walton v. United States, 92 U.S.App.D.C. 26, 202 F.2d 18.

Accordingly, I conclude that the court has the power to resentence. A disposition on the merits will await the affidavit of the United States Attorney, or, if necessary, a hearing.

### Supplemental Memorandum.

It has been represented to the court on behalf of the defendant, toward the exercise of the court's discretion in the matter of his resentencing, that his life would be in peril because of extremely bad health if he were to be imprisoned now; and it has been further represented that "Since December 30, 1952 it has become apparent that David Ribler is innocent of the charge for which he was imprisoned in Sing Sing * * *."

The Government, in opposing the motion to resentence, submits a letter from the Chief Medical Officer of the Federal Detention Headquarters where the defendant is currently being held. From this letter, it is apparent that the defendant is a sick man, although the doctor expressed no opinion on the peril to his life from continued imprisonment. The Medical Officer gave the diagnosis of pulmonary emphysema, advanced with pleural fibrosis, and the prognosis of "poor".

On the matter of the defendant's alleged innocence of the crime for which he was imprisoned in Sing Sing, the Government takes the position that it is irrelevant to the consideration of the motion, inasmuch as it is a matter which has been passed upon by the courts of the State of New York. However, the affidavit of the Assistant United States Attorney indicates that "In the interest of justice * * * the facts relating to this allegation that have come into the possession of the Government following investigation have been called to the attention of this Court."

The imposition of a sentence on a convicted defendant is not an exercise in mathematics or pure logic. Would that it were. For it is beyond question the most intellectually trying, painfully difficult, heart-rending and soul-searching task a judge has. There are, of course, some guideposts for the exercise of the power. The statutes present, for the most part, broad limits. Within those limits, the judge is guided by varied and oft-times conflicting theories. He may impose a sentence with no other objective than to punish the transgressor. Or he may feel it necessary to remove a criminal from intercourse with society in order to prevent future harm. Or he may feel that the deterrence of others from the path of crime is the indicated approach. Or he may be moved by reason, compassion or insight to provide an opportunity for rehabilitation. Any of these motives or any combination of them may be brought to bear in any particular case, and the judge may yet be left with the feeling of an unsatisfactory result. Each defendant presents his own problem, and, perhaps, so does each judge. Be that as it may, I must sentence this defendant as justly as it is within my power to do so, consistently with the dictates of my conscience.

The fact that the defendant may not be in peril of his life by continued imprisonment is not necessarily an argument that continued imprisonment is indicated. He is unquestionably quite ill, and after an imprisonment of over four years in a state prison, it would seem that an indulgence in mercy would not be a distortion of justice. In his condi-

tion he is not likely to offend the law, should he be permitted to leave prison. In the circumstances, to inflict additional imprisonment would be to detract from humanity, and to use the defendant as an object lesson for the deterrence of others would be an inappropriate exercise of the principle.

■ Moreover, the possibility that the defendant was not guilty of the crime for which he has just served four years in Sing Sing is not irrelevant to the exercise of the discretion of the court in passing sentence here. This court cannot and would not pass upon the matter of a conviction in a state court, which is none of our concern. But what is our concern is the condition of the defendant as he stands before our bar of justice for sentencing. If that condition should include a four year loss of liberty because of an error in the administration of justice, and if removal from society is not indicated, and if the circumstances are not appropriate for the practice of the theory of deterrence, and if rehabilitation is a possibility, justice does not demand that undeserved imprisonment be followed by more imprisonment. Nor is justice outraged by a merciful acknowledgement of unmerited punishment. We are not concerned with a mathematical equation between crime and punishment, but with a human equation of imponderables and intangibles. And justice is not a jacket cut to fit a severe pattern, but a supple garment to fit the spirit.

■ I do not know whether or not the defendant has served four years for a crime which he did not commit. But after his conviction in the state court, the federal investigatory and prosecuting authorities came into the possession of information which indicated the possibility that the conviction was based upon a mistaken identity. The Assistant United States Attorney then in charge of the federal case was sufficiently concerned to write a letter to the state prosecuting authorities advising them of the information in his possession. A copy of that letter is appended to this memorandum as an appendix. It would appear from a reading of the letter that the concern was justified. At the very least, a doubt has been raised. It may very well not be such a reasonable doubt as to have barred a conviction, but we are not now in the arena of trial. The doubt is one of which the defendant may be given the benefit in the consideration of the imposition of additional punishment, in the context of a different crime. And I choose, in my good conscience, to exercise my discretion in his favor.

Accordingly, I resentence the defendant as follows: imposition of sentence suspended on all counts with two years probation to commence immediately.

### APPENDIX

April 5, 1955

District Attorney's Office
Nassau County, L. I., N. Y.

Re: Charles Rizzo and
David Ribler

Dear Sir:

Certain information has come to my attention from federal investigatory agencies, which I am forwarding to you for whatever action you deem necessary.

Between April 1949 and February 1952, investigation of thefts of the mail of 86 letters was made, each of which contained a bank statement and cancelled checks. These thefts were committed all along the eastern seaboard. A total of 182 forged checks were drawn on the account of the addressees of these letters and subsequently presented for payment at the banks where the accounts were maintained. In all these operations young men were accosted on the street by a stranger and induced to present forged checks to banks. If these messengers were successful in negotiating the checks, the stranger would meet them a short distance from the bank and relieve them of the cash, paying them a small sum for their service.

A number of young men who have been used as messengers in this manner were subsequently located. Since all gave a

similar description of the swindler, the conclusion was reached that the same man had engaged each of them. In examining photographs of known criminals, many of the messengers selected that of David Ribler with varying degrees of certainty. (I do not believe Rizzo's photograph was shown to these persons at the same time because it wasn't believed that Rizzo was connected with this scheme.)

On September 1, 1950 the apartment house receptacle of Ben Scharfman, at 77-34 113th Street, Forest Hills, N. Y., was forced open by an unknown person who apparently stole a letter containing Mr. Scharfman's bank statement and cancelled vouchers drawn on his account with the Peoples State Bank of Baldwin, Baldwin, N. Y. Later, a number of checks bearing Mr. Scharfman's forged signature were cashed at the Peoples State Bank of Baldwin by young men who claimed that they were performing an errand for Mr. Scharfman. On July 10, 1952 Ribler was found guilty in the County Court of Nassau County of forging and uttering the checks drawn on the account of Ben Scharfman. Ribler was subsequently sentenced to serve a term of from 5 to 10 years in prison.

On December 1, 1950 two forged checks were cashed in Washington, D. C. after the depositor's bank statement letter was stolen from his mail box in that city. Both of the messengers involved in the cashing of these checks also selected Ribler's photograph and were positive he was the man who had given them the forged checks to cash. Ribler was taken into custody at Miami, Florida on December 22, 1950. He later proved that on December 1, 1950, when the above offense occurred in Washington, D. C., he had boarded a plane at Oakland, California and flew to Miami, Florida, arriving on December 2, 1950. He was therefore released.

On February 1, 1950 a forged check was cashed in Philadelphia, Pennsylvania under circumstances similar to those mentioned above. The messenger in this case was not located. However, it was later established that Ribler was in Miami, Florida from January 30 to February 3, 1950 and that he did not leave the city during that period. On March 2, 1951 a messenger was taken into custody when he attempted to cash a forged check in a Boston, Massachusetts bank. A bank statement letter addressed to the depositor had been previously stolen from in front of her apartment house door in that city. The messenger in this case also stated that the man who had given him the forged check resembled the photograph of David Ribler. A Post Office Inspector at Miami, Florida was notified by teletype and immediately located Ribler in that city.

On October 20, 1951 a forged check was cashed in a New York City bank. While there was no evidence of mail theft in this case all of the other elements of the *modus operandi* described above were present, including the use of a messenger. David Ribler was arrested on November 20, 1951 in New York City by local police when the messenger positively identified Ribler as the man who had given him a forged check to cash.

On February 28, 1952, Charles Rizzo was taken into custody while attempting to induce a messenger to cash a check. This check bore the forged signature of a depositor whose mail box had been tampered with two months before. The same messenger had been previously employed by Rizzo to cash another forged check drawn on the same account. Rizzo was convicted of this crime and received 3½ to 7 years in State prison.

A total of 17 young men who were previously employed as messengers in connection with these operations later positively identified Rizzo in a lineup. This included the messenger who was now positive that Rizzo, not Ribler, had given him the forged check to cash on October 20, 1951. To the knowledge of the investigatory agencies, there have been no similar operations since Rizzo's arrest.

On March 31, 1955, in the Federal District Court, Southern District of New York, on a Rule 20 proceeding, Charles

Rizzo pleaded guilty to the forging and uttering of a check on February 2, 1952 in Washington, D. C. The messenger in that case had previously stated that the photographs of Ribler and another person resembled the man who had given him the check. Later, a photograph of Rizzo was displayed to the messenger, who positively identified him as being the individual who gave him the check. Rizzo was sentenced to one year on each count, sentence to run concurrently. Sentence was suspended and Rizzo was placed on one day probation.

A Mr. Kestenbaum, the attorney for Ribler, stated to me that he had information that Rizzo admitted the Nassau County crime to inmates in State prison. Mr. Kestenbaum's telephone number is GR 5-7145.

Very truly yours,

J. Edward Lumbard,
United States Attorney.

By:————————————

David Jaffe,
Assistant U. S. Attorney.

NOTE: David Ribler died March 3, 1957.